IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2002 Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. R.M.M., SR.

**Appeal from the Juvenile Court for Knox County**
**No. K2519     Carey Garrett, Judge**

**FILED SEPTEMBER 23, 2002**

**No. E2001-02678-COA-R3-JV**

This appeal from the Knox County Juvenile Court questions whether the Juvenile Court erred in terminating the parental rights of the Appellant, R.M.M., Sr.,with respect to his child, R.M.M., II. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., joined.  CHARLES D. SUSANO, JR., J., filed a dissenting opinion.

Lance A. Evans, Maryville, Tennessee, for the Appellant, R.M.M., Sr.

Paul G. Summers, Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee Department of Children's Services

### OPINION

This appeal questions whether the Juvenile Court of Knox County erred in terminating the parental rights of the Appellant, R.M.M.,Sr., (hereinafter " R.M." )with respect to his child , R.M.M., II (hereinafter "R.M., II").

We restate the issues presented for our review as follows:

1. Whether the Juvenile Court had jurisdiction to proceed on a petition to terminate the parental rights of R.M. to his child in view of the fact that R.M had filed a notice of appeal of the Juvenile Court's previous order finding the child to be dependent and neglected and such appeal had not yet been heard.

2. Whether there was sufficient evidence to support the Juvenile Court's decision to terminate R.M.'s parental rights.

In March of 1999 R.M., II, who was born on December 20, 1998, was removed from his parents' home by the police after his mother suffered a psychotic episode during which she broke furniture and a window. R.M. was at work when this incident occurred. R.M., II was placed in the custody of the State of Tennessee, Department of Children's Services at that time, has remained in foster care ever since and is currently in foster care with relatives in New York.

At a hearing on February 16, 2000, upon petition of the Department, the Juvenile Court determined R.M., II to be dependent and neglected "due to the mother's current circumstances including her continuing mental health issues and the father's continuing incarceration[1] and pending competency evaluation to determine if he is competent to stand trial." (The circumstances of R.M.'s incarceration and competency evaluation are further discussed hereinafter.) On February 24, 2000, R.M. filed a "MOTION FOR APPEAL OF REFEREE'S DECISION," requesting that, should the Juvenile Court choose not to retry the case, that it be transferred to the Circuit Court for further appeal. The record does not show the disposition of this motion.

On May 17, 2001, the Department filed a petition to terminate R.M.'s parental rights[2]. A hearing was held on August 30, 2001, and based on the evidence presented at that hearing the Juvenile Court terminated R.M.'s parental rights by order entered October 1, 2001. This appeal followed.

Our review of this non-jury case is *de novo* upon the record of the proceedings below. There is no presumption as to the correctness of a trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996). However, unless there is a preponderance of evidence to the contrary, a trial court's findings of fact are presumed to be correct. Tenn.R.App.P. 13(d).

The first issue we address is whether the Juvenile Court had jurisdiction to proceed upon the petition to terminate R.M.'s parental rights.

R.M argues that, when he filed his notice of appeal of the decision of the Juvenile Court declaring R.M., II to be dependent and neglected, the Juvenile Court lost jurisdiction to hear the petition to terminate his parental rights and its order granting the petition is, therefore, void. We disagree.

---

[1] The record shows that R.M. was incarcerated upon charges of assault, vandalism, kidnaping and resisting arrest which allegedly arose out of a domestic dispute with R.M., II's mother. All of these charges were subsequently dropped.

[2] The record shows that R.M., II's mother previously surrendered her parental rights in July, 2000. She and R.M. were divorced in November of 1999.

In support of his argument R.M. cites the following language from the case of *State Dep't. of Health/Children's Services v. Rogoish*, an unreported opinion of this Court filed in Knoxville on August 26, 1997:

> ... the General Assembly clearly intended that cases where a parent is deprived of custody of a child be given preference and processed expeditiously. Such cases are to take precedence over other cases except those which are also statutorily mandated to be heard within a specific time frame.

> T.C.A. § 37-1-159 gave the plaintiff the right to a trial *de novo* before the Circuit Court if her appeal was properly perfected and she was entitled to an expeditious hearing. The summary dismissal of the appeal has no basis in law. Parties who bring themselves within the statutory provision providing for an appeal are entitled to the appeal as a matter of right.

While we do not disagree with these statements of the Court set forth in the *Rogoish* case, we do not believe they resolve the jurisdictional issue presented by R.M. in the case now before us. In addressing this issue we find guidance in the case of *In re T.H.*, an unreported opinion of this Court filed in Nashville on April 10, 1996.

In *In re T.H.*, the appellant father had filed notice of his appeal to the Circuit Court of a Juvenile Court determination that his children were dependent, neglected and abused. Before a *de novo* trial was conducted in the Circuit Court pursuant to the father's appeal, the Juvenile Court conducted an evidentiary hearing upon a petition to terminate the father's parental rights filed by the Department of Human Services. The father argued that it was error for the Juvenile Court to consider its findings and order from the neglect-abuse hearing in the termination hearing given the fact of the pending appeal of the neglect-abuse ruling. This Court disagreed noting that neither the Department of Human Services nor the Juvenile Court were endeavoring to treat the findings in the neglect-abuse case as conclusive in the termination of parental rights proceeding and that the Juvenile Court only referred to its order in the neglect-abuse case to show that it had already heard evidence that the father had abused his children and that this conduct constituted severe child abuse under State law. In that case we stated that "the fact that the neglect-abuse case might have been appealed does not prevent the juvenile court from relying on evidence presented in an earlier proceeding involving the same parties and the same issues."

Although the case before us does not involve the evidentiary issue raised in *In re T.H.*, it is manifest under the circumstances presented in that case that the Juvenile Court has jurisdiction to proceed on a petition to terminate parental rights during the pendency of an appeal of its prior determination of dependency and neglect with respect to the same parties.

The second issue presented for our review is whether the Juvenile Court's decision to terminate R.M.'s parental rights was supported by sufficient evidence.

Grounds for termination of parental rights are set forth at T.C.A. 36-1-113(g). Before a trial court can terminate parental rights it must find, by clear and convincing evidence, that at least one of these grounds has been established and that termination of parental rights is in the best interest of the child. T.C.A. 36-1-113(c).

The judgment of the Juvenile Court terminating R.M.'s parental rights in this case recites the following findings:

> That the child, [R.M., II], has been removed by order of a court for a period of six (6) months. The conditions which led to the removal of [R.M., II] still persist. Other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of Respondent. There is little likelihood that these conditions will be remedied at an early date so that [R.M., II] can be returned to the Respondent in the near future. The continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

These findings of the Court are in accord with one of the grounds for termination set forth at T.C.A. 36-1-113(g) which provides as follows at subsection (3):

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>   (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>   (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>   (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The Juvenile Court judgment additionally recites the following finding:

> That Respondent is incompetent to adequately provide for the further care and supervision of the child because the parent's mental condition is presently so impaired and is so likely to remain so that it is unlikely that he will be able to assume the care of and responsibility for the child in the near future.
>
> ...

That it is in the best interest of [R.M., II] and the public that all of Respondent's parental rights to this child be terminated...

T.C.A. 36-1-113(g)(8)(B)(i) provides that:

(B)  The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
(i)  The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and
(ii)  That termination of parental or guardian rights is in the best interest of the child.

It is undisputed that R.M., II has been removed from his father's home by court order for six months.  However,  R.M. argues that the Juvenile Court erred in finding that the conditions which led to the removal cannot be remedied in a timely manner and will cause the child to be subject to further abuse or neglect.

R.M asserts that R.M., II was removed because of a psychotic episode suffered by the child's mother.  R.M asserts that his own mental condition was not a condition that led to the removal and did not become an issue until after the removal.

T.C.A. 36-1-113(g)(3)(A)(i) clearly provides that grounds for termination of parental rights may lie in either the persistence of the conditions which led to the removal *or* in the persistence of "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect."  In this case the Court ordered that R.M.'s parental rights be terminated on the basis of his persistent mental condition which the Court determined is "presently so impaired and is likely to remain so that it is unlikely that he will be able to assume the care of and responsibility for the child in the near future".  It is our task to review the record to verify that it contains clear and convincing evidence which supports this determination of the Court.

In *O'Daniel v. Messier*, 905 S.W.2d 182 (Tenn. Ct. App. 1995) we stated as follows at page 188 regarding the standard of clear and convincing evidence*:*

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence.  See *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992).  It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.  *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn.Ct.App. 1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.Ct.App. 1985).

The Juvenile Court made the following findings of fact after its review of the evidence presented. The record shows that these findings of the Court with respect to R.M.'s mental condition are primarily based upon the testimony of Dr. Thomas Hanaway, a clinical psychologist who testified as an expert witness in the case:

> [R.M.'s] condition cannot be cured but only treated to a certain degree. [R.M.] denies he has a mental illness and denies he has ever had a mental illness. He says he does not need the medication but is taking it because his lawyer wants him to. He says the medication messed him up and that the doctors don't know a thing.
>
> Dr. Hanaway testified that [R.M.] told him he would take medication until he gets little [R.M., II] back and then will stop taking his medication and, in fact, has repeatedly said he will stop taking his medication. [R.M.] denies making these statements yet insists that he doesn't need medication. The Court finds and believes that [R.M.] made these statements and will in all probability quit taking his medication when the case ends.
>
> Dr. Hanaway says that he was repeatedly hospitalized because he would quit taking his medication and that he will have to take the medication for the remainder of his life. The proof is that [R.M.] is dangerous because of his attitude towards his illness. He was incarcerated on charges arising out of a domestic [sic] that resulted in [R.M., II] being placed in the Department of Children's Services custody.
>
> Dr. Hanaway's testimony is that it would be detrimental to a two (2) year old child to be exposed to [R.M.'s] paranoia and delusions. The chaos and instability would be damaging to the child. The father's fixed delusional beliefs and complete denial of any mental illness will prevent him from being able to parent.

Dr. Hanaway testified at trial that R.M. suffers from schizo-affective disorder which consists of schizophrenia and concurrent symptoms of major depression, mania or a mixed mood disorder. While conceding that "[R.M.'s] symptoms are controlled fairly well when he takes the medication", Dr. Hanaway also asserted that:

> ... [R.M.'s] history shows that when he doesn't take his medication he's repeatedly rehospitalized.
>
> So I think that that would be a very bad circumstance, to put a little boy in with a father that's going to be going through these cycles of not taking his

medication, becoming psychotic, having to be hospitalized, then he stabilizes pretty quickly, and then -- I just don't think that kind of instability would be -- it would be damaging to a child. You know, it's almost like a little child would have to be the adult in a situation like that. That wouldn't be good for them at all. They need -- a child needs a stable kind of -- stable parents.

Dr. Hanaway was asked why he thinks that R.M. will fail to take his medication:

Q So we really don't know with [R.M.]; he may stay on his medication appropriately from now on, we don't know that he'll go off? His history's not good, but he may turn things around and do the right thing for his child, right? We don't -- isn't that correct?

A The past history, of course, is the best predictor of future behavior, so I think it's likely that it will happen in the future. But, of course we don't know a hundred percent, with a hundred percent certainty.

Our review of the Lakeshore Mental Health Institute records from which Dr. Hanaway asserts that he learned of R.M.'s previous hospitalizations confirms that R.M. was hospitalized on seven occasions. Prior to his first hospitalization at Lakeshore, the records indicate that R.M. was hospitalized at the Union City Hospital psychiatric unit in 1990 and at some time he was hospitalized 'apparently' in a 'mental health hospital' in Memphis. Thereafter, on January 9, 1994, R.M. was first admitted to Lakeshore and was discharged on February 2, 1994. R.M. was again hospitalized at Lakeshore from August 22, 1994, until September 14, 1994, and from October 12, 1995, until October 27, 1995. In August of 1999, R.M. was incarcerated in Union County upon criminal charges[3] of assault, vandalism, kidnaping and resisting arrest allegedly arising out of a domestic dispute between R.M. and his wife. On December 30, 1999, R.M was transferred from jail to the Forensic Service Program at Middle Tennessee Health Institute for evaluation of his competency to stand trial. He was determined incompetent to stand trial and committable and was, accordingly, committed to Lakeshore on February 17, 2000. R.M. was subsequently determined competent to stand trial after a period of time at Lakeshore and he was discharged on July 12, 2000.

We do not find that the available records of R.M.'s hospitalization history warrant Dr. Hanaway's conclusion that R.M. will probably not take his medication in the future. Of the seven hospitalizations noted, it is not evident that the admissions to either the Union City hospital or the Memphis facility were precipitated by R.M.'s failure to take his medication. Although it appears that R.M.'s failure to take his medication was a factor in his first three admissions to Lakeshore between January of 1994 and October 1995, it was apparently not a factor in his admission to Middle Tennessee Health Institute in December of 1999 nor was it a factor in his final admission to Lakeshore in February of 2000. Both of these two latter hospitalizations came about, not because

---

[3]The record shows that R.M. denied the validity of these charges and further shows that all of these charges were dropped upon entry of a *nolle-prosequi* by the Union County Criminal Court on September 29, 2000.

R.M failed to take his medication, but because of the need for an evaluation of R.M.'s competency to stand trial for the criminal charges which were pending against him at that time. At trial Dr. Hanaway testified that he did not know the last time R.M. failed to take his medication. Based upon our assessment of the record we cannot say that there is any proof that R.M. has failed to take his medication since October of 1995 - almost six years before the termination hearing and over three years before the birth of R.M., II. Accordingly, we cannot agree that Dr. Hanaway's testimony constitutes clear and convincing evidence that R.M. will not take his medication to the extent that such testimony is based upon R.M.'s hospitalization history.

Dr. Hanaway testified that he also based his conclusion that R.M will probably not take his medication upon R.M.'s own statements to him. Dr. Hanaway asserts that R.M. told him that he would discontinue taking his medication as soon as his son is returned to him:

> ...And he said that to me on a number of occasions, he doesn't need these medications, he's only taking the medication in order to get his son back and because his attorney has told him that he needs to take the medication. And he said that once he gets his son back, then he's going to stop taking the medication because he doesn't have those problems. He said they're for people that have schizophrenia, highs, lows, hallucinations. He said, 'I don't have any of those problems.' He's very consistent with that.

R.M.'s trial testimony confirms that he does not believe he has a mental illness, that he does not believe his doctors know anything and that he does not need his medication. R.M. denies telling Dr. Hanaway that he will stop taking his medication once he gets his son back.

Although R.M. may discontinue taking his medication if he regains custody of his son we do not find that that contingency alone is sufficient to warrant termination of his parental rights at this time. T.C.A. 36-1-113(g)(8)(B)(i) requires clear and convincing evidence that "the parent's...mental condition is *presently* so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care and responsibility for the child in the near future...." (emphasis added) As previously noted, Dr. Hanaway testified that R.M.'s symptoms are fairly well controlled when he's on his medication. Although Dr. Hanaway testified that R.M.'s beliefs that he does not have a psychiatric condition and that he does not need any medication for his condition would impair his ability to presently parent his son, he further testified that he had observed R.M. interacting with R.M., II and that the interaction seemed relatively appropriate. In this regard Dr. Hanaway stated that R.M. appeared to be accurately tuned in to how his son was feeling during the visitation, that R.M. has the sensitivity to parent a child and that he can appreciate the needs of a child. Dr. Hanaway further stated that R.M., II's responses were "pretty good" to hypothetical questions about how he would handle a variety of child rearing issues including education issues, health issues, rudeness, lying, disobedience and temper tantrums. Although Dr. Hanaway asserted that he could not forsee a parent-child relationship between R.M. and his son even under the circumstances of R.M. being on his medication and even if the

relationship were allowed to build with frequent visitation, elsewhere in the record Dr. Hanaway testified as follows:

> Q  If [R.M.] has got a home and takes care of it, he's got an appropriate vehicle and has sufficient income, and he stays on his medication do you think in that particular -- if you just assume that he stays on his medication do you think that he'd -- don't you think he'd be able to parent his child?
>
> A  Let me think about that just a second. It's difficult for me to speculate from seeing him in a very well supervised condition to know what it might be like in the home, say in Madisonville by himself. If you could -- if you, you know, believe that things are going to get better and he's definitely going to stay on his medication -- I can't get out of my head the fact that he keeps getting off his medication and getting rehospitalized, okay?
>
> Q  Fair enough.
>
> A That's creating the difficulty for me. But if he could do that and get better, yeah, he might be able to do okay.
>
> Q  And if he had family assistance, and [R.M.'s relatives] that you talked to over the phone, if they're if they're nearby and he had assistance from them to keep an eye on things and to help him on any tougher issues, do you think that would enhance his chances of succeeding as a parent?
>
> A It would if it was set up the way I would want it to be, and that would be that the other -- that Johnny and Michelle[4] would raise him, and that [R.M.] would be like an uncle and he would visit and have a lot of contact. If it was set up that way I'd be okay with it.
>
> Q Well, you'd be certain then, a hundred percent?
>
> A Yes. Yes.

We have hitherto recognized that "parents have a fundamental right to the care, custody, and control of their children." and, although parental rights may be terminated, there must be "clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96 (Tenn. Ct App. 1988). It is our determination that the evidence presented in this case is equivocal and fails to satisfy the requisite standard of proof.

---

[4] R.M.'s brother and sister-in-law.

For the foregoing reasons the judgment of the Juvenile Court is reversed and the cause remanded for such further proceedings, if any, as may be necessary and for collection of costs below. Costs of appeal are adjudged against the State of Tennessee Department of Children's Services.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE